This opinion was filed for record

at __8:00am__ on __Sept 13, 2018__

_Susan L. Carlson_
SUSAN L. CARLSON
SUPREME COURT CLERK

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 13 2018

_Fairhurst, C.J_
CHIEF JUSTICE

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) | No. 94325-7 |
| v. | ) | En Banc |
| ADRIAN SASSEN VAN ELSLOO, | ) | |
| Petitioner. | ) | Filed __SEP 1 3 2018__ |

WIGGINS, J.—Adrian Sassen Van Elsloo appeals the midtrial dismissal of an impaneled juror who was excused because she had a minor connection to an important defense witness. The trial judge in this case erred by dismissing an impaneled juror after multiple days of trial testimony when there was no evidence that the juror was biased. We must now decide the remedy for an erroneous dismissal of an impaneled juror. We hold that the defendant is entitled to a new trial if there is any reasonable possibility that the erroneous dismissal stemmed from the juror's views on the merits of the case. However, if an impaneled juror's dismissal does not stem from his or her view of the merits of the case but is nonetheless erroneous, no new trial will be granted if the State establishes that the error was harmless. Here, there is a reasonable possibility that juror 12 was dismissed because of her views of the merits of the case. Sassen Van Elsloo is entitled to a new trial.

Sassen Van Elsloo also appeals the sufficiency of evidence supporting a firearm enhancement. We hold that the State presented sufficient evidence to support the enhancement.[1]

## FACTS AND PROCEDURAL HISTORY

On September 7, 2012, while monitoring traffic, Bellingham police officer Lewis Leake saw a black Kia Sorrento make an illegal right turn. When Leake tried to stop the Kia, a chase ensued. When Leake overtook the Kia, he found it stopped in the middle of the road with the driver-side door open and the driver gone. A woman, Athena Aardema, was in the passenger seat and ultimately identified the driver as Adrian Sassen Van Elsloo.

The police permitted Aardema to leave the scene. While helping Aardema remove her belongings from the car, Officer Leake saw the handle of a shotgun. The police impounded the Kia and obtained a search warrant.

The search revealed a shotgun in the cargo hold. The search also revealed a digital scale, methamphetamine, 5 morphine pills, a pipe, a butane torch, 30 alprazolam pills, 67 clonazepam pills, seven small bags of heroin, a bill of sale with Sassen Van Elsloo's name, four prepaid cell phone cards, seven "burner" cell phones, gold jewelry, a bundle of 20 $1 bills, an iPad, the title for a 1990 Lincoln Town Car, a .38 revolver loaded with four bullets, a .22 pistol loaded with a magazine containing five bullets, six more rounds of ammunition, and a sock holding eight 12 gauge shotgun shells.

---

[1] Though we are vacating Sassen Van Elsloo's trial, we recognize that this issue may arise on remand, and so we are addressing it for guidance. RAP 2.4.

2

Three months later, Leake stopped a 1990 Lincoln Town Car driven by Sassen Van Elsloo. Sassen Van Elsloo was charged with nine felony counts relating to the earlier encounter. The State added firearm enhancements to five of the charges.

At trial, Sassen Van Elsloo's defense theory was misidentification, supported by an alibi witness named Sharon Burton. Burton testified that Sassen Van Elsloo was at her home on the day of the incident and therefore could not have been driving the Kia on that day.

Following Burton's testimony and cross-examination, juror 12 informed the bailiff that she recognized Burton from Burton's work with juror 12's nephew. Burton worked as an inpatient coordinator and a drug and alcohol counselor for the Lummi Nation. Juror 12 had met Burton when she went to the Lummi Business Council's "CARE" office, a chemical dependency treatment program for Lummi Nation tribal members, to obtain information that would help juror 12's nephew receive chemical dependency treatment services. Juror 12 had not recognized Burton's name on the juror questionnaire, but after seeing her testify, she recalled meeting Burton twice. Juror 12 said that she did not socialize with Burton, and that she would likely not remember Burton if she later saw her on the road.

The trial court allowed the parties to question juror 12 about her experience with Burton. The prosecutor pressed juror 12 about whether she had a "positive feeling" toward Burton:

> [PROSECUTOR]: . . . So you just told us about asking Ms. Burton to help you with your nephew?
>
> JUROR NO. 12: Yes.

3

[PROSECUTOR]: Was this able to help you?

JUROR NO. 12: Well, she got us the help for our nephew to go into treatment. We got the help, they paid for the treatment program and the bus ticket for him to go there and back.

[PROSECUTOR]: So did you have a positive experience with her?

JUROR NO. 12: Well, I never did the intervention part of it because I left that up to my sister, his mother, and his siblings because he had four siblings, four sisters, so I kind of stepped back once my family kind of got back into trying to help him.

[PROSECUTOR]: Right, I understand that.

JUROR NO. 12: Do I believe she was a positive person for him? I can't say that because I think what was more positive for my nephew is when he finally went to treatment.

[PROSECUTOR]: My question is not so much about the nephew, but do you feel like, do you feel like it was a positive experience for you to deal with her?

JUROR NO. 12: I am not really sure. . . .

[PROSECUTOR]: Was there a negative experience at all?

JUROR NO. 12: No, there was no good or bad, it was just all, you know, normal as it would be trying to just get the help I wanted for my family member.

[PROSECUTOR]: Well . . . it sounds to me like your nephew did get the help he needed?

JUROR NO. 12: Yes.

[PROSECUTOR]: You're pretty happy about that?

JUROR NO. 12: Yes.

[PROSECUTOR]: So that's kind of a positive thing or positive feeling that you're having about Ms. Burton; is that right?

JUROR NO. 12: Well it's not Ms. Burton, it's my nephew I'm more positive with. She wasn't inter-reacting with my nephew while he was gone or when he came back. It's more what he did for himself.

[PROSECUTOR]: I understand that, but it sounds like you kind of intellectualized it.

4

I mean you're talking about, I mean you had a pretty good feeling, you must have a pretty good feeling about Ms. Burton and how she helped you; isn't that fair?

JUROR NO. 12: I guess. It's not, I wouldn't call it from her. I'd call it from our own community for the help so that's what your tribe is for is to try to help the funds with our community people that need the assistance.

[PROSECUTOR]: What do you think about me cross-examining her, is that something that concerned you?

JUROR NO. 12: No, I just brought up that I think I knew her. I don't socialize with her or anything. I just kind of recognize her. I don't know her by name, or first name.

[PROSECUTOR]: Okay.

JUROR NO. 12: I can tell you that if I was to see her again out on the road I probably won't remember her again any way.

5 Verbatim Report of Proceedings (VRP) (July 29, 2014) at 856-59. After questioning juror 12, the prosecutor could not point to any evidence of bias: "Now, whether I can absolutely put a finger on that she can't be fair or whether what she says is about, what she says about being fair or not I think that's kind of beside[ ] the point." 5 VRP (July 29, 2014) at 860.

The prosecutor sought dismissal nonetheless, claiming that Burton was an important witness for the defense and that "if the jurors believe Ms. Burton then it's a big deal" because "that means my case goes nowhere." 5 VRP (July 29, 2014) at 860.

Defense counsel objected to the motion, calling juror 12's interactions with Burton perfunctory and minimal, noting that juror 12 stated nothing about being unable to be fair, and pointing out that juror 12 was the only tribal member on the jury panel. The court acknowledged that it was a "close case" but dismissed juror 12 because "Ms. Burton is a critical witness and even though there is not a real strong relationship between the juror and the witness I think given the importance of the witness's role in the case it's

5

appropriate for juror 12 to be excused . . . ." 5 VRP (July 29, 2014) at 861. The jury

convicted Sassen Van Elsloo on all counts.

## ANALYSIS

Sassen Van Elsloo appealed on two grounds: that juror 12 was improperly

dismissed and that the State presented insufficient evidence to support the firearm

enhancements. *State v. Sassen Van Elsloo*, No. 72553-0-I, slip op. at 3-6 (Wash. Ct. App.

Feb. 6, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/725530.pdf. The

Court of Appeals affirmed the trial court on both issues, and Sassen Van Elsloo appealed

to this court. We reverse in part and affirm in part.

I.    Dismissal of an Impaneled Juror for Bias

Sassen Van Elsloo appeals the trial court's decision to dismiss juror 12 after she

informed the court that she recognized one of the defense witnesses. The trial court

abused its discretion when it dismissed juror 12.

A. Standard of Review

We review a trial court's decision to discharge a juror for abuse of discretion. *State*

*v. Depaz*, 165 Wn.2d 842, 858, 204 P.3d 217 (2009). To determine if an impaneled juror

has displayed actual bias warranting dismissal, the trial judge "will act as both an observer

and decision maker." *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d 866 (2000). In doing

so, the trial judge must weigh the credibility of the challenged juror. *Id.* "'A [trial] judge with

some experience in observing witnesses under oath becomes more or less experienced

in character analysis, in drawing conclusions from the conduct of witnesses.'" *State v.*

*Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991) (quoting 14 LEWIS H. ORLAND & KARL B.

TEGLAND, WASHINGTON PRACTICE: TRIAL PRACTICE CIVIL § 203, at 332 (4th ed. 1986)).

6

Because a reviewing court "'has not had the benefit of this evidence [we] recognize[ ] the advantageous position of the trial court.'" *Id.* (quoting 14 ORLAND & TEGLAND, *supra*). Thus, we must accord substantial deference to the trial court's decision of whether the juror is actually biased such that dismissal is appropriate. *Jorden*, 103 Wn. App. at 229.

Nonetheless, the trial court must apply the correct legal standard and rest its decision on facts supported by the record. A trial court abuses its discretion if its decision is "manifestly unreasonable or based on untenable grounds." *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). "A decision is based 'on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995)). And, "[a] trial court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." *Fisons Corp.*, 122 Wn.2d at 339.

B. Standard of Proof

The Sixth Amendment to the United States Constitution and Washington Constitution article I, section 22 guarantee the right to a fair trial "by an impartial jury." U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. This right exists throughout the entire trial process and is safeguarded in part by statutes and rules that require the trial judge to dismiss biased jurors. RCW 4.44.170; RCW 2.36.110; CrR 6.5. The operation of these statutes and rules depends on whether the juror is a potential, impaneled, or deliberating juror.

"Potential jurors" are those who have been summoned for jury duty prior to the beginning of trial, have appeared, and have not been excused. RCW 4.44.120. This opinion refers to "impaneled jurors" as jurors who have been sworn and are seated on the panel while the trial is ongoing and testimony is being heard. We refer to "deliberating jurors" as those who were impaneled, listened to the trial testimony, and have begun deliberation of the case with the objective of reaching a verdict.

To resolve this case, we must first determine the standard of proof necessary for a trial judge to dismiss an *impaneled* juror for bias. To do so, we review prior decisions in which this court and the Court of Appeals have addressed the standard of proof necessary to dismiss a potential juror for bias. We hold that dismissal of an impaneled juror for bias requires the same findings as dismissal of a potential juror for bias—proof that the juror has formed a biased opinion and, as a result, cannot try the case impartially.

1. Dismissal of a *potential* juror for actual bias requires proof that the juror cannot try the case impartially

The dismissal of a potential juror during voir dire is primarily governed by statute. Relevant here is RCW 4.44.170, which outlines three reasons potential jurors may be challenged for particular cause: implied bias, actual bias, and physical inability.

We are concerned here with "actual bias," defined by RCW 4.44.170 as "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging."

RCW 4.44.190 outlines the facts that a trial judge must find to dismiss a potential juror who was challenged for actual bias:

8

> [O]n the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon what he or she may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but *the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.*

(Emphasis added.) Actual bias must therefore be established by proof. *Noltie*, 116 Wn.2d at 838. Equivocal answers alone are not sufficient to establish actual bias warranting dismissal of a potential juror. *Id.* at 839. Rather, "the question is whether a juror with preconceived ideas can set them aside." *Id.* The trial court must be satisfied that the potential juror is unable to "try the issue impartially and without prejudice to the substantial rights of the party challenging" before dismissing the juror for actual bias. RCW 4.44.170(2). Furthermore, a mere possibility of bias is not sufficient to prove actual bias; rather, the record must demonstrate "that there was a probability of actual bias." *Noltie*, 116 Wn.2d at 838-39.

2. <u>Dismissal of an impaneled juror for bias requires the same findings as dismissal of a potential juror for bias: proof that the juror cannot try the case impartially</u>

We now turn to the issue present here: dismissal of an *impaneled* juror. Discharge and excusal of an impaneled juror is governed by RCW 2.36.110 and CrR 6.5. The statute imposes on the judge a duty to excuse any impaneled juror who, in the opinion of the judge, has demonstrated unfitness to continue on the jury "by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110. The rule requires the court to discharge any impaneled juror who "is found unable to perform the duties" and to appoint an alternate juror. CrR 6.5. Together, the statute and rule "place a

9

continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." *Jorden*, 103 Wn. App. at 227.

Relevant to this action, RCW 2.36.110 requires a judge to excuse an impaneled juror who has manifested unfitness by reason of bias. However, the statute does not elaborate on the definition of bias or the findings necessary to warrant the dismissal of a juror by reason of bias.

The Court of Appeals has applied to impaneled jurors the standard of actual bias required to dismiss a potential juror. *See Hough v. Stockbridge*, 152 Wn. App. 328, 216 P.3d 1077 (2009). In *Hough*, the trial court refused to dismiss an impaneled juror for reason of bias. *Id.* at 340. To determine whether the impaneled juror manifested unfitness due to bias, the Court of Appeals applied the requirements of "actual bias" found in RCW 4.44.170 and defined in RCW 4.44.190, the statutes governing the for-cause dismissal of potential jurors. In doing so, the court made two inquiries: first, whether the juror had formed an opinion; and second, whether the juror was capable of disregarding that opinion and trying the case impartially. *Id.*

We now adopt this definition of actual bias and apply it to the dismissal of impaneled jurors for bias: when challenging a juror for bias, the challenging party must prove actual bias, regardless of whether the challenge occurs during voir dire or during the trial. Accordingly, to properly dismiss an impaneled juror for actual bias, the challenging party must prove (1) that the impaneled juror has formed or expressed a biased opinion and (2) that "from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

10

C. Dismissal of Juror 12

Here, the trial court abused its discretion by dismissing juror 12 on untenable grounds and for an untenable reason. *See Rohrich*, 149 Wn.2d at 654. The record indicates that juror 12 was dismissed because Burton was a critical witness for the defense, not because juror 12 displayed actual bias.

The importance of a witness alone is not a proper basis on which to dismiss an impaneled juror who had prior contact with that witness if the record does not indicate that the juror displayed actual bias. The governing statute does not contemplate the role, import, or significance of a particular witness as a basis for dismissal. *See* RCW 2.36.110. Furthermore, a juror's acquaintance with a witness is not, in itself, grounds for finding a juror unfit to serve. *See State v. Tingdale*, 117 Wn.2d 595, 601, 817 P.2d 850 (1991); *see also State v. Kloepper*, 179 Wn. App. 343, 317 P.3d 1088 (2014). Rather, the challenging party must show that the juror formed an opinion because of his or her prior acquaintance with the witness and that the juror cannot disregard that opinion and try the case impartially. Without the requisite showing of the juror's bias and inability to be fair, the importance of a witness is irrelevant.

Here, the record contains no indication that juror 12 formed an opinion about Burton or that such opinion would prevent her from trying the case impartially. The record indicates that juror 12 was indifferent to Burton, not biased toward her. Juror 12 made it clear that her interactions with Burton were neither positive nor negative, despite being

asked four times by the prosecutor whether she had positive feelings toward Burton.[2]

Upon telling the bailiff that she recognized Burton, juror 12 indicated that "her knowledge

of Ms. Burton would not affect her assessment of the testimony in any way." 5 VRP (July

29, 2014) at 853.

Defense counsel, the State, and the trial judge all agreed that juror 12 had not

shown bias. Defense counsel objected to the dismissal and argued that juror 12 "stated

nothing about how she couldn't be fair or that she had any feeling one way or another." 5

VRP (July 29, 2014) at 861. The trial court agreed that juror 12 hadn't expressed any bias,

replying, "You know, that's true." *Id.* And by the prosecutor's own admission, he could not

articulate or point to any bias or unfitness on the part of juror 12: "whether I can absolutely

put a finger on that she can't be fair . . . [is] kind of beside[ ] the point." 5 VRP (July 29,

2014) at 860.

Further, the record does not support a finding that juror 12 was unable to try the

case impartially. Regardless of juror 12's feelings about Burton, the statute states that a

---

[2] When first asked by the prosecutor whether she had a positive experience with Burton, juror 12 explained her limited involvement with Burton, and she could not even say that Burton played a positive role for her nephew. When the prosecutor asked a second time whether juror 12 had a positive experience with Burton, juror 12 said that she could not say it was a positive experience. When the prosecutor then asked whether juror 12's experience with Burton was negative, juror 12 again reiterated her indifference to Burton, saying, "No, there was no good or bad." 5 VRP (July 29, 2014) at 857. The third time asking whether juror 12 had a positive experience with Burton, the prosecutor switched to leading questions, this time telling juror 12 that juror 12 had a positive feeling about Burton. To this, juror 12 maintained that "it's not Ms. Burton, it's my nephew I'm more positive with." The fourth time the prosecutor asked juror 12 whether she had a positive experience with Burton, the prosecutor did so by stating, "[Y]ou must have a pretty good feeling about Ms. Burton and how she helped you; isn't that fair?" 5 VRP (July 29, 2014) at 858-59. To this, juror 12 finally replied, "I guess," before clarifying that the good feeling she had was not from Burton, but "from our own community for the help." 5 VRP (July 29, 2014)" at 859.

biased opinion alone is not sufficient to dismiss the juror for actual bias. RCW 4.44.190.

The juror must be unable to try the case impartially due to the biased opinion. *Id.*

Here, neither the state nor the trial judge inquired whether juror 12 could put aside any prior opinions and judge the case fairly, and the record contains no facts supporting such a finding. Furthermore, while this court has emphasized the importance of deferring to the trial court's observations of demeanor, facial expressions, and nonverbal communications to assess a juror's fitness, *see Noltie* 116 Wn.2d at 839, the trial court here made no mention on the record of juror 12's demeanor or other nonverbal communication.

The record indicates that the trial court dismissed juror 12 because of the importance of Burton as a witness for the defense, not because juror 12 was biased or unable to try the case fairly. Instead of arguing that juror 12 had expressed a biased opinion and would be unable to try the case impartially, the prosecutor argued that keeping juror 12 on the jury "just didn't feel fair" because "if the jurors believe Ms. Burton then it's a big deal"; "if they believe her that means my case goes nowhere." 5 VRP (July 29, 2014) at 860.

The trial judge conceded that juror 12 had not expressed any bias but dismissed juror 12 anyway, explaining that juror 12 was being dismissed because of the significance of Burton's role as a witness for the defense: "Counsel [for the State] points out correctly that Ms. Burton is a critical witness and even though there is not a real strong relationship between the juror and the witness[,] I think given the importance of the witness's role in the case it's appropriate for juror 12 to be excused . . ." 5 VRP (July 29, 2014) at 860. The trial court then stated unequivocally, "I'm satisfied that State's request that the juror be

disqualified is not for any discriminatory or inappropriate purpose, and *given the importance of Ms. Burton's testimony and that's why I'm granting the State's motion.*"[3] 5 VRP (July 29, 2014) at 862 (emphasis added).

This was an abuse of discretion. The importance of Burton as a defense witness is an improper basis on which to dismiss juror 12, and no facts in the record indicate that juror 12 displayed actual bias. Therefore, the trial court abused its discretion when it dismissed juror 12. *See Rohrich*, 149 Wn.2d at 654 (a trial court abuses its discretion if its decision "rests on facts unsupported in the record or was reached by applying the wrong legal standard").

---

[3] In objecting to juror 12's dismissal, defense counsel mentioned that juror 12 was the only person on the jury who was a tribal member of the Lummi Nation. However, on appeal, Sassen Van Elsloo did not challenge his convictions on *Batson* grounds. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The issue of juror dismissal based on racial bias grounds was not briefed by either party, nor was it discussed during oral argument. Therefore, the issue is not properly before this court. *State v. Johnson*, 119 Wn.2d 167, 170, 829 P.2d 1082 (1992) ("While appellate courts may accept review of constitutional issues not raised in the trial court pursuant to RAP 2.5(a)(3), the defendant must raise the issue on appeal in accordance with the Rules of Appellate Procedure. Issues not so raised, even constitutional issues, are not properly before this court.").

Furthermore, the record is inadequate to analyze this case on the basis of a *Batson* violation. *Batson*, 476 U.S. 79. Under *Batson*, to establish that a juror was dismissed on racial grounds, the defendant must first establish a prima facie case that "'gives rise to an inference of discriminatory purpose.'" *City of Seattle v. Erickson*, 188 Wn.2d 721, 726, 398 P.3d 1124 (2017) (quoting *Batson*, 476 U.S. at 94). If a prima facie case is successfully made, "the burden shifts to the prosecutor to provide an adequate, race-neutral justification for the strike." *Id.* at 727. If the prosecutor provides a race-neutral explanation, "the court must weigh all relevant circumstances and decide if the strike was motivated by racial animus." *Id.* Here, when objecting to juror 12's dismissal, defense counsel stated, "I guess I should note my objection is also just my concern that an aspect of this is a tribal member and I think the only tribal member that is on our panel." 5 VRP (July 29, 2014) at 861. Despite this objection, the defendant did not ask for a ruling under *Batson* and its Washington progeny, nor did the defendant establish a discriminatory purpose requiring a response from the State. Accordingly, the record is inadequate to analyze this case as presenting a *Batson* issue.

14

II.    Sassen Van Elsloo Is Entitled to a New Trial

All criminal defendants are constitutionally entitled to a unanimous jury verdict, WASH. CONST. art. I, § 21; *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), reached by an impartial jury, U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.

We must now consider the appropriate remedy for the erroneous dismissal of an impaneled juror. The dissent maintains that this case is controlled by prior case law.[4] To the contrary, this case presents an issue of first impression for this court. We have case law that addresses the remedy for the wrongful dismissal of a *potential* juror and case law that addresses the remedy for the wrongful dismissal of a *deliberating* juror. However, we have never answered the question posed here: What is the remedy for an abuse of discretion in removing an *impaneled* juror who has heard evidence during the trial but is not yet deliberating?

We hold that the rights implicated by the erroneous dismissal of an impaneled juror lie between the rights implicated by the erroneous dismissal of a potential juror and the erroneous dismissal of a deliberating juror. Thus, to determine the appropriate remedy when an impaneled juror is erroneously dismissed, we analyze the framework already

---

[4] The dissent maintains that precedent controls this case and that our holding unnecessarily departs from case law. The dissent points to *State v. Gentry* and *State v. Williamson* to contend that a defendant has no right to a particular juror and that a defendant is entitled to a new trial only upon a showing that the erroneous dismissal of an impaneled juror resulted in prejudice. Dissent at 5 (quoting *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995) and citing *State v. Williamson*, 100 Wn. App 248, 253, 996 P.2d 1097 (2000)). Neither case addresses the remedy for an abuse of discretion resulting in the wrongful dismissal of an impaneled juror. *See Gentry*, 125 Wn.2d at 616 (holding that defendant's challenge to the trial court's replacement of a regular juror with an alternate "may not be raised for the first time on appeal" where defendant agreed to the panel of deliberating jurors and, "in fact, participated in the error that resulted in replacing a regular juror with an alternate."); *see also Williamson*, 100 Wn. App at 250 (holding that "the trial court did not abuse its discretion by allowing the late peremptory challenge"). Thus, neither case is controlling here, and it is appropriate to address the issue now.

established for remedying the erroneous dismissals of potential and deliberating jurors. In doing so, we conclude that prejudice exists when the erroneous dismissal of an impaneled juror stems from concern over the juror's views of the merits of the evidence presented, thus warranting a new trial. However, when the erroneous dismissal of an impaneled juror does not stem from concern over the juror's views of the merits of the evidence presented, no new trial is warranted if the State establishes that the error was harmless.

A. The Erroneous Dismissal of a Potential Juror

We look first at the remedy for the erroneous dismissal of a potential juror. If a trial judge erroneously dismisses a potential juror, the defendant is entitled to a new trial if he or she establishes that the erroneous dismissal was prejudicial.

During voir dire, any party may challenge a potential juror. RCW 4.44.130. Challenges may be peremptory or for cause. *Id.* A "peremptory challenge" is "an objection to a juror for which no reason need be given, but upon which the court shall exclude the juror." RCW 4.44.140. Each party has a limited number of peremptory challenges. *See* RCW 4.44.130; CrR 6.4(e). Challenges for cause, however, "are narrowly specified by statute and court rule," and to remove a juror for cause, "a party must be able to state on the record a legally sufficient reason for the challenge." *State v. Vreen*, 99 Wn. App. 662, 668, 994 P.2d 905 (2000), *aff'd*, 143 Wn.2d 923, 26 P.3d 236 (2001). There is no limit to the number of potential jurors that each party may challenge for cause. *See* RCW 4.44.130.

When the trial court dismisses a potential juror, whether properly or improperly, the parties call and examine the next potential juror. He or she will either be preemptively challenged by a party, dismissed for cause, or determined suitable to sit on the jury. The

parties and the court repeat this process until a full panel of suitable jurors is selected. In addition, the trial judge has discretion to impanel one or more alternate jurors. CrR 6.5. After a full panel of suitable jurors and alternates is selected, those jurors will be sworn, and the trial will commence.

During this process, the defendant's constitutional rights to an impartial jury or a unanimous verdict are not automatically violated when the trial court erroneously dismisses a potential juror. This is true because "'[n]o party can acquire a vested right to have a particular member of the panel sit upon the trial of his cause, until he has been accepted and sworn. It is enough that it appear that his cause has been tried by an impartial jury.'" *State v. Phillips*, 65 Wash. 324, 326, 118 P. 43 (1911) (quoting 1 SEYMOUR D. THOMPSON, A TREATISE ON THE LAW OF TRIALS § 120 (1889)); *see also State v. Larkin*, 130 Wash. 531, 533, 228 P. 289 (1924) ("[A] litigant has no right to have his case tried by any particular juror or jurors."); *Creech v. City of Aberdeen*, 44 Wash. 72, 74, 87 P. 44 (1906) ("All that the appellant can claim is the right to have its case tried by an impartial jury.").

Furthermore, erroneously dismissing a potential juror does not cause a biased juror to be impaneled. Rather, after the trial court dismisses a potential juror, the process of jury selection will continue until an impartial jury has been selected. When a potential juror is dismissed, "'it is to be presumed that the juror chosen in the place of the one rejected, is an impartial juror, such as the law requires.'" *Phillips*, 65 Wash. at 327 (quoting *State v. Barnes*, 34 La. Ann. 395, 397 (1882)); *see also State v. Persinger*, 62 Wn.2d 362, 366, 382 P.2d 497 (1963) ("The law presumes that each juror sworn in a case is impartial and above legal exception, otherwise he would have been challenged for 'cause.'").

Therefore, if a fair and impartial jury was ultimately obtained, "'notwithstanding the exclusion of the juror that the accused was anxious to have, . . . surely we cannot conclude that the accused was so seriously injured by the ruling as to entitle him to a new trial.'" *Phillips*, 65 Wash. at 327 (quoting *Barnes*, 34 La. Ann. at 397). This is so because, assuming a suitable jury is impaneled, "the record of the voir dire shows affirmatively that the error was 'cured' by the selection of an impartial juror." *Hinton v. United States*, 979 A.2d 663, 689 (D.C. 2009).

Defendants do not have the right to any particular juror, and the erroneous dismissal of a potential juror does not cause a biased juror to be impaneled. Thus, as we said in *Phillips*, if a juror is dismissed before being impaneled, the defendant is not entitled to a new trial, even if the juror "'was rejected by the court upon insufficient grounds, unless through rejecting qualified persons, the necessity of accepting *others* not qualified has been purposely created.'" *Phillips*, 65 Wash. at 326 (quoting 1 THOMPSON, *supra*). In other words, the erroneous dismissal of a potential juror does not automatically violate a defendant's constitutional right to an impartial jury, and for this reason, a defendant must prove that the improper dismissal of a potential juror was prejudicial to be entitled to a new trial. *See id.* at 326-27.

B. The Erroneous Dismissal of a Deliberating Juror

In contrast to the dismissal of a potential juror, the erroneous dismissal of a *deliberating* juror requires reversal and remand, regardless of prejudice, because the dismissal implicates the rights to an impartial jury and a unanimous verdict. *See State v. Elmore*, 155 Wn.2d 758, 123 P.3d 72 (2005); *State v. Ashcraft*, 71 Wn. App. 444, 463, 859

18

P.2d 60 (1993) (improperly dismissing a deliberating juror implicates "a defendant's constitutional right to a fair trial before an impartial jury and to a unanimous verdict").

This is so in part because jury deliberation is a crucial phase of trial during which the jurors discuss the case and arrive at a verdict. Jury deliberations must remain secret. *Elmore*, 155 Wn.2d at 770; *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997) ("The secrecy of deliberations is the cornerstone of the modern Anglo-American jury system."). And, jurors cannot discuss the case until the parties have presented evidence and testimony, the judge has instructed the jurors on the law, and they have been directed to begin deliberations. *See* RCW 4.44.280. Here, at the outset of trial, the judge instructed the jurors, "Until you are in the jury room with your fellow jurors for those deliberations you must not discuss the case with your fellow jurors or with anyone else." 1 VRP (July 22, 2014) at 9-10.

In *Elmore*, we addressed the standard of proof trial courts must apply when considering whether a deliberating juror is unfit to continue deliberating and the remedy that follows an erroneous dismissal. 155 Wn.2d 758. In *Elmore*, members of a deliberating jury accused the sole holdout juror of refusing to follow the law. *Id.* at 763. The judge dismissed the juror. *Id.* at 764.

In determining the correct standard of proof and the resulting remedy applicable to the dismissal of a deliberating juror, we recognized the importance of balancing the defendant's right to a unanimous verdict and the right to an impartial jury with allowing the trial court's broad discretion. *Id.* at 777. We further recognized that when evaluating a deliberating juror for refusal to follow the law, trial courts "must take special care not to

delve into the substance of deliberations or the thought process of any particular juror." *Id.* at 771.

We held that "[i]f it appears that a trial court is reconstituting a jury in order to reach a particular result, then the right to an impartial jury is sacrificed." *Id.* at 772. Additionally, a dismissal that stems from a juror's views of the merits of the case violates the defendant's right to a unanimous jury verdict "because it 'would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case.'" *Id.* at 771 (internal quotation marks omitted) (quoting *Sanders v. Lamarque*, 357 F.3d 943, 945 (9th Cir. 2004)). Thus, if a deliberating juror is accused of refusing to follow the law, "that juror cannot be dismissed when there is any reasonable possibility that his or her views stem from an evaluation of the sufficiency of the evidence." *Id.* at 778.

Applying the "reasonable possibility" standard, we reversed because the record supported a reasonable possibility that the holdout juror's refusal to convict stemmed from an evaluation of the witnesses' credibility. *Id.* at 778-79. As to the remedy, when the record shows a reasonable possibility that the request for the juror's dismissal stems from the juror's opinion of the merits of the case, dismissal of that juror violates the defendant's rights to a fair and impartial jury and a unanimous verdict, which necessitates a reversal and remand. *Id.* at 766, 771, 780-81.

In *State v. Berniard*, the Court of Appeals applied the *Elmore* standard where a juror's extreme emotional distress stemmed, at least in part, from a difference in opinion with other jurors regarding the merits of the case. 182 Wn. App. 106, 122, 327 P.3d 1290 (2014). The court recognized that the circumstance differed from *Elmore*, but the concern

20

was similar: a juror was dismissed because of that juror's views on the merits of the case, violating the defendant's rights to a unanimous verdict and an impartial jury. *Id.* at 123. The court further held, "Denial of the right to an impartial trier of fact is a classic structural error, requiring reversal without a showing of prejudice. The remedy for improper dismissal of a deliberating juror is reversal and remand for a new trial." *Id.* at 123-24 (citations omitted).

In *Depaz*, this court declined to extend the "reasonable possibility" standard to the dismissal of a holdout juror who committed misconduct during deliberations. 165 Wn.2d 842. We nonetheless vacated the defendant's conviction without a finding of prejudice, holding that the trial court "abused its discretion by reaching a decision based on untenable reasons" because the record did not support a finding that the improper communication prejudicially influenced the juror. *Id.* at 862.

Accordingly, these authorities establish that reversal is required and no showing of prejudice is necessary if the erroneous dismissal of a deliberating juror results in the violation of a constitutional right.

In contrast, the *proper* dismissal of a deliberating juror and the replacement of that juror with an alternate is not a constitutional violation if (1) the alternate juror was only temporarily excused and not dismissed at the beginning of deliberations, CrR 6.5, and (2) after replacement, the trial court instructed the jury to disregard all previous deliberations and begin new deliberations. *See Ashcraft,* 71 Wn. App. at 464 ("[I]t was reversible error of constitutional magnitude to fail to instruct the reconstituted jury on the record that it must disregard all prior deliberations and begin deliberations anew." (emphasis omitted)); *see also State v. Fisch,* 22 Wn. App. 381, 383, 588 P.2d 1389 (1979) (concluding that the 12

21

jurors "must reach their consensus through deliberations which are the common experience of all of them").

In sum, when a deliberating juror is erroneously dismissed, a new trial is warranted if there is any reasonable possibility that the dismissal arose because of that juror's view of the merits of the case. Similarly, a new trial is warranted when a deliberating juror is dismissed on grounds that are not supported by the record. But, when a deliberating juror is dismissed on proper and supported grounds, the replacement of that juror with an alternate is not a constitutional violation warranting a new trial, as long as the trial judge takes the appropriate steps to ensure the defendant's rights to an impartial and unanimous jury are not violated.

C. The Erroneous Dismissal of an Impaneled Juror

We must now determine the appropriate remedy for the erroneous dismissal of an impaneled juror. The erroneous dismissal of an impaneled juror shares constitutional implications with the erroneous dismissal of both potential jurors and deliberating jurors.

On one hand, "[i]f it appears that a trial court is reconstituting a jury in order to reach a particular result," then a defendant's constitutional rights to a unanimous verdict by an impartial jury are implicated. *See Elmore*, 155 Wn.2d at 772. This is true regardless of whether the jury is impaneled or deliberating: once the jury has begun to hear testimony and consider evidence, individual jurors may no longer be viewed as fungible. *See Phillips*, 65 Wash. at 326 (acknowledging the distinction between a potential juror and an impaneled juror: "[n]o party can acquire a vested right to have a particular member of the panel sit upon the trial of his cause, *until he has been accepted and sworn*" (emphasis added) (quoting 1 THOMPSON, *supra*). An impaneled juror will carry his or her

consideration, evaluation, and views of the evidence into deliberations leading to a verdict. Thus, dismissing a juror *because of* those views of the merits of the case jeopardizes our constitutional guaranty that a verdict is unanimous.[5] WASH. CONST. art. I, § 21. Replacement with an alternate does not cure this: "[i]t is no answer to say that the 12 jurors who ultimately comprised [the] jury were unobjectionable. Reasonable and dispassionate minds may look at the same evidence and reach a different result." *State v. Irby*, 170 Wn.2d 874, 886-87, 246 P.3d 796 (2011).

On the other hand, if an impaneled juror's erroneous dismissal does not stem from the juror's evaluation of the evidence, and a suitable alternate replaces the dismissed juror, the circumstances resemble the dismissal of a potential juror, in which the error is cured by the replacement with an impartial juror. Just as the dismissal of a potential juror during voir dire does not *cause* a biased juror to be impaneled, replacing an impaneled juror with a suitable alternate does not place a biased juror onto the panel. To the contrary, an alternate juror is presumably unbiased, having been approved and sworn by the trial judge. *See Persinger*, 62 Wn.2d at 366 ("The law presumes that every juror sworn in the case is impartial and above legal exception, otherwise he would have been challenged for 'cause.'").

---

[5] The dissent states that the lead opinion "appears to equate 'bias' with the juror's 'views of the merits of the case.'" Dissent at 7. In fact, a juror's bias is crucially distinct from a juror's views of the merits of the case. "Bias" is an inability to be fair and partial because of a preconceived opinion. RCW 4.44.190. In contrast, a juror's "views of the merits of the case" are the way a seated or deliberating juror has understood, interpreted, or weighed the evidence and testimony that has been presented in the trial. To dismiss a juror for bias, whether seated or impaneled, is proper. To dismiss a juror because he or she assessed evidence in any particular way, whether impaneled or deliberating, is not.

For this reason, the erroneous dismissal of a juror and replacement with an alternate does not automatically violate a defendant's constitutional rights, as long as the dismissal does not stem from the juror's views of the merits of the case. *See Gentry*, 125 Wn.2d at 616 (holding that the right to an impartial jury was not violated by the replacement of an impaneled juror with an alternate when the defendant participated in and accepted the selection of three alternate jurors before trial); *c.f. Tingdale*, 117 Wn.2d at 602 (holding that erroneously dismissing a potential juror is not grounds for exception "unless 'through rejecting qualified persons, the necessity of accepting others not qualified has been purposely created'" (internal quotation marks omitted) (quoting *Phillips*, 65 Wash. at 326). Furthermore, although the rule for dismissing and replacing an impaneled juror acts as a safeguard for constitutional rights, failure to comply with the rule does not necessarily violate the constitution. *See Gentry*, 125 Wn.2d at 616 (noting that a challenge to the trial court's compliance with CrR 6.5 involves "compliance with a procedural rule rather than a constitutional issue").

Keeping in mind the legal framework governing the dismissal of potential and deliberating jurors and the distinct interests and constitutional rights at play when an impaneled juror is dismissed, we now hold the following. The defendant's constitutional right to a unanimous verdict is violated and a new trial is warranted if there exists a reasonable possibility that the trial judge dismissed an impaneled juror because of that juror's "views of the sufficiency of the evidence." *See Elmore*, 155 Wn.2d at 761. However, if an impaneled juror's dismissal does not stem from his or her view of the merits of the case but is nonetheless erroneous, a new trial is not warranted when the State establishes that the wrongful dismissal resulted in no harm to the defendant. *Hinton*, 979 A.2d at 689-

24

90; *United States v. Donato*, 321 U.S. App. D.C. 287, 99 F.3d 426, 430 (1996); *Pickering v. People*, 66 V.I. 276, 290-91 (2017); *Washington v. State*, 955 So. 2d 1165, 1173 (Fla. Dist. Ct. App. 2007).[6]

To show that an erroneous dismissal of an impaneled juror was harmless, the State must present evidence that allows the appellate court "to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Hinton*, 979 A.2d at 691 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)). If the appellate court is in "virtual equipoise" as to the harmlessness of the error, the error should be treated as if it were not harmless. *Id.* While it may be difficult for the government to show the absence of prejudice, it is not impossible: "we would suppose that if the government's case is strong and there is no reason apparent in the record to think the erroneously removed juror would have dissented, a reviewing court could be satisfied that the juror substitution had no substantial influence on the outcome." *Id.* at 691-92.

---

[6] The dissent maintains that our holding departs from precedent and overturns *Gentry*, which noted that a defendant has no right to be tried by a particular juror. Dissent at 13. The holding here does neither. We recognize that a defendant cannot argue generally that he or she has an independent right to a particular juror. However, if we carry the dissent's persistent reliance on *Gentry* to its logical conclusion, we would never reverse for an error in the acceptance or removal of jurors during a trial. The trial court could make any ruling excusing a juror, no matter how erroneous, and there would be no recourse. While a defendant has no independent right to a particular juror, it cannot be said that the absence of such a right insulates the court from failing to protect a defendant's constitutional rights or that the substitution by an alternate juror automatically cures any constitutional violation.

D. New Trial

Here, the trial court abused its discretion by improperly dismissing juror 12, and there is a reasonable possibility that the improper dismissal was based on juror 12's views of the merits of the case. Therefore, Sassen Van Elsloo is entitled to a new trial.

Juror 12 repeatedly denied that she had positive feelings toward Burton because of their prior encounters, and the State failed to articulate any evidence that juror 12 was biased or unfit to serve as a juror. Rather, the State argued that juror 12 should be dismissed because Burton was an important witness for the defense, that it "just didn't feel fair," and that "if the jurors believe Ms. Burton then it's a big deal." 5 VRP (July 29, 2014) at 860.

The trial judge dismissed juror 12 not because she was biased but because of the importance of Burton's testimony to the success of the defendant's case. The trial judge stated, "Counsel [for the State] points out correctly that Ms. Burton is a critical witness and even though there is not a real strong relationship between the juror and the witness[,] I think given the importance of the witness's role in the case it's appropriate for Juror 12 to be excused . . . ." 5 VRP (July 29, 2014) at 861. The trial court then stated unequivocally, "I'm satisfied that State's request that the juror be disqualified is not for any discriminatory or inappropriate purpose, and *given the importance of Ms. Burton's testimony and that's why I'm granting the State's motion.*"[7] 5 VRP (July 29, 2014) at 862 (emphasis added).

---

[7] In objecting to juror 12's dismissal, defense counsel also stated concern that juror 12 was the only person on the jury who was a tribal member of the Lummi Nation. The trial court noted that it shared the concern but dismissed juror 12 nonetheless. We have previously noted that we did not find a *Batson* challenge present here. However, the fact that juror 12 and Burton shared a connection through the Lummi Nation may support our conclusion that juror 12 was dismissed

There is at the least a very real possibility that the judge dismissed juror 12 because of her evaluation of the testimony and her views of the merits of the case. Indeed, it is nearly impossible to draw any other conclusion when a juror was dismissed because of an entirely unsupported concern that the juror will believe testimony of a witness whose testimony, if believed by the jurors, "means [the State's] case goes nowhere." 5 VRP (July 29, 2014) at 860. It would be illogical to conclude otherwise—there is no indication that juror 12 was biased for or against Burton and defendant Sassen Van Elsloo; the only possible reason to excuse juror 12 was for her views on the merits of the case.

Therefore, the trial court abused its discretion by dismissing juror 12 without finding actual bias and violated Sassen Van Elsloo's right to a unanimous verdict when it dismissed juror 12 because of her views on the merits of the case. We reverse the Court of Appeals and remand for a new trial.

III.    Firearm Enhancements

We now turn to the second issue in this case: whether there was sufficient evidence to support the firearm enhancements with which the State charged Sassen Van Elsloo. *See* RCW 9.94A.825, .533(3). Though we need not address this question in light of our decision to reverse and remand for a new trial, we nonetheless do so for guidance as the issue may arise on remand. RAP 2.4. We hold that there was sufficient evidence and affirm the imposition of the enhancements.

---

because of her views of the merits of the case. We need not reach this issue to resolve the case, however, and because it was not briefed by either party, we choose not to.

A. Standard of Review

Whether a person is armed is a mixed question of law and fact. *State v. Schelin*, 147 Wn.2d 562, 565-66, 55 P.3d 632 (2002) (plurality opinion). This court determines whether the facts are sufficient as a matter of law to prove that the defendant was armed by de novo review. *Id.* at 566. Determining whether a defendant is armed for the purpose of a deadly weapon enhancement is a fact-specific decision. *State v. Neff*, 163 Wn.2d 453, 462, 181 P.3d 819 (2008) (plurality opinion). To determine the sufficiency of evidence, we must establish "whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). We must view the evidence in the light most favorable to the State and draw all inferences in its favor. *Id.*

B. The State Presented Sufficient Evidence To Support Firearm Enhancements on Sassen Van Elsloo's Drug Charges

To establish that a defendant was armed for the purpose of a firearm enhancement, the State must prove (1) that a firearm was easily accessible and readily available for offensive or defensive purposes during the commission of the crime and (2) that a nexus exists among the defendant, the weapon, and the crime. *State v. Eckenrode*, 159 Wn.2d 488, 493, 150 P.3d 1116 (2007) (plurality opinion).

The presence, close proximity, or constructive possession of a weapon at the scene of a crime is, by itself, insufficient to show that the defendant was armed for the purpose of a firearm enhancement. *State v. Barnes*, 153 Wn.2d 378, 383, 103 P.3d 1219 (2005); *Schelin*, 147 Wn.2d at 563-64; *State v. Gurske*, 155 Wn.2d 134, 138, 118 P.3d 333 (2005). Rather, for a person to be armed during the commission of a crime, the weapon must be

easily accessible and readily available for use for either offensive or defensive purposes. *Barnes*, 153 Wn.2d at 383; *Gurske*, 155 Wn.2d at 137; *State v. Murillo Valdobinos*, 122 Wn.2d 270, 282, 858 P.2d 199 (1993). A defendant "does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement," and the State "need not establish with mathematical precision the specific time and place that a weapon was readily available and easily accessible, so long as it was at the time of the crime." *State v. O'Neal*, 159 Wn.2d 500, 504-05, 150 P.3d 1121 (2007).

In addition to proving that a weapon was readily available and easily accessible at the time of the crime, the State must offer sufficient evidence that there existed a nexus between Sassen Van Elsloo, the gun, and the commission of the drug crimes. The requirement of a nexus between the defendant, the weapon, and the crime "serves to place 'parameters . . . on the determination of when a defendant is armed, especially in the instance of a continuing crime such as constructive possession' of drugs." *Gurske*, 155 Wn.2d at 140 (alteration in original) (quoting *Schelin*, 147 Wn.2d at 568). Without this nexus, there is a risk that a defendant will be punished under the firearm enhancement for having a gun unrelated to the crime. *Id*. To determine whether there was a nexus between the defendant, the weapon, and the crime, the court looks at the nature of the crime, the type of weapon, and the circumstances under which it was found. *Schelin*, 147 Wn.2d at 570.

Here, Sassen Van Elsloo argues that the shotgun was too far away from him to qualify as easily accessible and readily available because Sassen Van Elsloo would have had to exit the car or move to the back seat to reach the shotgun. Sassen Van Elsloo also argues that there was insufficient evidence to support a nexus between him, the drugs,

and the crime because "[t]here was also no evidence that Sassen-Vanelsloo ever had, or indicated an intent to use, the shotgun to protect the drugs." Suppl. Br. of Pet'r at 20. In making this argument, Sassen Van Elsloo relies on this court's decision in *Gurske*, where we found insufficient evidence to support a firearm enhancement. 155 Wn.2d 134.

In *Gurske*, the police found a zipped-up backpack in the back seat of the defendant's truck containing an unloaded pistol, a loaded magazine, and drugs. We determined that the gun was not easily accessible and readily available at the time of the crime because the backpack containing the gun was zipped and could not be removed by the defendant unless he exited the truck.[8] *Id.* at 143-44.

Additionally, when the crime is of a continuing nature, such as a drug operation, a nexus exists if the firearm is "there to be used" in the commission of the crime. *Id.* at 138. Applying that standard in *Gurske*, we found that no nexus existed between the weapon and the crime because the State had presented no evidence that Gurske had used or had access to the weapon during the commission of a crime, such as when he acquired or was in possession of the methamphetamine. *Id.* at 143.

Sassen Van Elsloo argues that his case cannot be distinguished from *Gurske*. However, as the Court of Appeals pointed out, the present case is more closely aligned with those cases in which we found that reasonable juries could infer that guns kept at the site of ongoing drug crimes were easily accessible during and had a sufficient nexus to the commission of the crime.

---

[8] For other cases in which there was insufficient evidence to show that a weapon was easily accessible and readily available, see *State v. Johnson,* 94 Wn. App. 882, 974 P.2d 855 (1999), and *State v. Ague-Masters*, 138 Wn. App. 86, 156 P.3d 265 (2007).

For example, in *Eckenrode*, we found sufficient evidence to support a firearm enhancement. 159 Wn.2d 488. There, Eckenrode called the police to report that an intruder was in his house and alerted the dispatcher that he was armed and ready to shoot the intruder. *Id.* at 491. When the police responded, Eckenrode was sitting in his front yard in a lawn chair. *Id.* The police swept the house for intruders and instead found methamphetamine, dried marijuana, a loaded rifle, an unloaded pistol, and the aroma of marijuana. *Id.* at 491-92. After obtaining a warrant, the police found a marijuana grow and records of marijuana sales. *Id.* at 492. Eckenrode was arrested outside his home, unarmed. He was convicted of the unlawful manufacture and possession of marijuana, and the jury found that he was armed on both counts. *Id.*

There was sufficient evidence to support the firearm enhancements, even though Eckenrode was unarmed at the time of arrest. *Id.* at 494. The gun was easily accessible and readily available: Eckenrode himself told the 911 operator that he had a loaded gun in his hand and was prepared to shoot the intruder. *Id.* We also found a sufficient nexus among Eckenrode, the weapon, and the drug crimes, holding that a "jury could readily have found that the weapons were there to protect the criminal enterprise." *Id.*

We distinguished *Eckenrode* from *Gurske* on the grounds that the State in *Gurske* presented no evidence that the weapon "was readily accessible at any relevant time or that there was any connection between the weapon and the crime," *id.* at 495, while in

31

*Eckenrode*, the State presented evidence that the weapons were there to protect the

marijuana grow, *id.* at 494.[9]

Here, there is sufficient evidence to conclude that the gun in Sassen Van Elsloo's

car was easily accessible and readily available during the commission of the drug crimes

and that a nexus existed between Sassen Van Elsloo, the gun, and the crime.

The State presented sufficient evidence that Sassen Van Elsloo was engaged in

possessing and selling illegal drugs from the Kia as part of an ongoing criminal enterprise:

Aardema testified that she and Sassen Van Elsloo were selling drugs; the car contained

a locked bank bag holding controlled substances separated and packaged in a style

consistent with personal use and sales; numerous burner cell phones, glassine envelopes,

small "baggies," and a digital scale of the style often used in the sale of controlled

substances were found in the backpack in the car; and a locked safe containing a roll of

$1 bills, a revolver, and a small semiautomatic handgun was found in the back of the Kia,

the key to which was found in the passenger console.

---

[9] *See also O'Neal*, 159 Wn.2d 500 (holding that there was sufficient evidence to support a firearm enhancement, even though defendants were not armed at the time of arrest, where police found substantial evidence that defendants were using their home as a drug manufacturing site, including over 20 guns, body armor, a police scanner, and night vision goggles; and a jury could reasonably infer that the guns were readily available to protect the drug operation); *Neff*, 163 Wn.2d at 465 (holding that there was sufficient evidence to support a firearm enhancement where the defendant was manufacturing methamphetamine in his garage and the police found three loaded pistols nearby, supporting the finding that the defendant had manufactured methamphetamine with guns at hand); *State v. Simonson*, 91 Wn. App. 874, 883, 960 P.2d 955 (1998) (holding that it was reasonable for the jury to infer that four loaded guns and three unloaded guns kept on the premises of a drug manufacturing site were there for the purpose of defending the site from attack); *State v. Easterlin*, 159 Wn.2d 203, 207, 210, 149 P.3d 366 (2006) (holding that sufficient evidence existed to uphold a firearm enhancement when the defendant was found asleep in a car with a gun on his lap and cocaine in his sock, noting, "[s]o long as the facts and circumstances support an inference of a connection between the weapon, the crime, and the defendant, sufficient evidence exists" to support a finding that the defendant was armed).

Additionally, sufficient evidence connected Sassen Van Elsloo to the drug operation being run out of the Kia. The backpack contained several receipts with Sassen Van Elsloo's name; his DNA was found on the shotgun; and Aardema testified that Sassen Van Elsloo had been driving on the date of the incident, that the safe belonged to Sassen Van Elsloo, and that he took it wherever he went.

Finally, there was sufficient evidence to find a nexus between the shotgun and Sassen Van Elsloo's ongoing possession and distribution of the drugs. First, the shotgun was found less than a foot from the backpack, which contained the drugs and was the sole source of the drug charges. Second, the gun was placed in the car with its grip facing at an angle toward the passenger compartment of the car, making it easy for someone entering the car to quickly grab the gun. Third, the gun had a shell in the magazine that could have been readily chambered and fired at another person. And fourth, the shotgun was kept out of the locked safe, unlike the revolver and semiautomatic handgun, which were not the subjects of the firearm enhancements. This is sufficient to support a conclusion that the firearm was "there to be used" in the commission of the drug crimes. *Gurske*, 155 Wn.2d at 138.

Taking the evidence in the light most favorable to the State, there is sufficient evidence to demonstrate that the shotgun was easily accessible and readily available, and that there was a nexus among Sassen Van Elsloo, the shotgun, and the commission of the drug crimes.

CONCLUSION

We reverse the Court of Appeals in part and affirm in part. First, the trial court abused its discretion when it dismissed juror 12. Second, Sassen Van Elsloo is entitled to a new trial because there is a reasonable possibility that juror 12 was dismissed because of her views of the merits of the case. Third, the State presented sufficient evidence that Sassen Van Elsloo was armed as necessary to uphold a firearm enhancement.

We remand for further proceedings consistent with this decision.

Wiggins, J.

WE CONCUR.

_____

_____

_____

_____

_____

_____

No. 94325-7

GORDON McCLOUD, J. (concurring)—The trial court presided over a good

portion of the trial in this case and heard one alibi witness in particular. It then made

the assumption that juror 12 would be too favorable to that alibi witness and, hence,

too favorable to the defense. 5 Verbatim Report of Proceedings (VRP) (July 29,

2014) at 861-62 ("Counsel points out correctly that Ms. [Sharon] Burton is a critical

witness[,] and even though there is not a real strong relationship between the juror

and the witness I think given the importance of the witness's role in the case it's

appropriate for Juror 12 to be excused . . . given the importance of Ms. Burton's

testimony and that's why I'm granting the State's motion.").

The State made the same assumption. *Id.* at 860 ("I viewed Ms. Burton to be

a very critical witness in this case. She is an alibi witness and, you know, if the jurors

believe Ms. Burton then it's a big deal. I mean if they believe her that means my

case goes nowhere.").

1

But there was only one basis for this assumption: the fact that juror 12 and the critical alibi witness were both affiliated with the same tribe, the Lummi Nation.[1]

It is impermissible to dismiss a seated juror for either reason—the assumption that the seated juror might be leaning toward crediting defense witnesses or the fact that a juror and a defense witness share an affiliation with the same tribe. It is doubly impermissible to dismiss a juror for both reasons. In this case, both reasons together threaten the defendant's constitutional rights to a jury trial, to jury unanimity, and to equal protection, as well as the juror's own constitutional right to serve free from discrimination on the basis of tribal citizenship. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 21, 22. For that reason, the midtrial dismissal of juror 12 amounts to constitutional error; the State has the burden of proving such error harmless beyond a reasonable doubt, and the State has failed to carry that burden.

I therefore concur in the lead opinion's conclusion that we must reverse and remand for a new trial. I write separately to address the basis for the trial court's

---

[1] The trial court believed that juror 12 is a Lummi citizen. 5 VRP (July 29, 2014) at 853, 859. Juror 12's statements indicate that this is correct. *Id.* at 858-59 ("I'd call it from our own community . . . that's what your tribe is for to try to help the funds with our community people that need the assistance."). Witness Burton worked for the Lummi Nation as an inpatient coordinator and drug and alcohol counselor. *Id.* at 770. It is unknown if Burton is also a Lummi citizen.

2

error: the assumption that one tribal member is incapable of fairly evaluating the

testimony of a witness associated with the same tribe.[2]

BACKGROUND

On September 7, 2012, Bellingham police officer Lewis Leake attempted to

stop a black Kia Sorrento SUV after observing it commit a traffic violation. 4 VRP

(July 28, 2014) at 535-40. Instead of stopping, the Kia sped away and led Officer

Leake on a chase. 1 VRP (July 22, 2014) at 85-89; 4 VRP (July 28, 2014) at 541-44.

When the officer finally caught up to the Kia, it was stopped in the middle of the

road with the driver's side door open and the driver gone. 1 VRP (July 22, 2014) at

90; 4 VRP (July 28, 2014) at 546-48. Inside the Kia was passenger Athena Aardema,

who eventually identified the driver as Adrian Sassen Van Elsloo. 1 VRP (July 22,

2014) at 90-91; 4 VRP (July 28, 2014) at 550-51, 554-56, 684. After observing the

---

[2] The lead opinion states that the defense did not raise a *Batson* objection to the seating of juror 12, lead opinion at 26 n.7, and so it will not address the question of discrimination against juror 12 for that reason. The lead opinion is correct that the defense did not raise a *Batson* challenge—i.e., a challenge to the initial decision about seating the juror due to race discrimination. *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). But issues concerning race are not necessarily confined to the time of jury selection. They might arise during the course of the trial. Indeed, defense counsel raised the issue of juror 12's tribal affiliation when arguing against dismissal in the trial court. 5 VRP (July 29, 2014) at 861-62. And the trial court ruled on that issue. *Id.* Thus, the reasons for dismissing juror 12 certainly fall within the scope of the issues presented. *See generally Clark County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 177 Wn.2d 136, 143-46, 298 P.3d 704 (2013).

3

handle of a shotgun inside the Kia, Officer Leake impounded the car. 4 VRP (July 28, 2014) at 558-60. When police searched the vehicle several days later, they found guns and ammunition, various drugs, a digital scale, and receipts for prepaid cell phones. 2 VRP (July 23, 2014) at 300-02, 305, 315-19, 324, 330, 337; 4 VRP (July 28, 2014) at 560-62, 566-67, 635, 659-64, 667-70. Several months later, the Whatcom County prosecutor charged Sassen Van Elsloo with nine felonies in connection with the weapons and contraband recovered from the Kia.

Sassen Van Elsloo's defense theory at trial was that he was not in the Kia at all—he was elsewhere. In support of that theory, he presented testimony by an alibi witness, Sharon Burton. 5 VRP (July 29, 2014) at 770-826. Burton testified that she was an inpatient coordinator and counselor for the Lummi Nation's drug and alcohol treatment program, that Aardema and Sassen Van Elsloo had a "[v]ery volatile" relationship, and that Sassen Van Elsloo had been at Burton's house on September 7, 2012—the day of the crime. *Id.* at 770, 774-76. Burton remembered her activities that day because she had gone to the doctor in the morning, regarding complications from cataract surgery, and then called in sick for the rest of the day. *Id.* at 799. She testified that Sassen Van Elsloo started receiving phone calls at some point after 11:30 a.m. that day, and that the calls seemed to upset him. *Id.* at 780. On cross-examination, Burton was evasive about statements she made to investigators before

trial. *Id.* at 807-11. A written report about those statements indicated that she told investigators she was not sure whether she had arrived home in the late morning or the early afternoon on September 7, 2012. *Id.* at 825, 881. Burton also admitted that she was lying down and resting for part of the time that she claimed Sassen Van Elsloo could not possibly have left her house and that Sassen Van Elsloo called her home several times from jail after his arrest on the charges in this case. *Id.* at 815-17. In short, Burton was a crucial, but imperfect, alibi witness.

After Burton's testimony, juror 12 approached the bailiff and indicated that she had previously met Burton. *Id.* at 853. The connection was so remote that juror 12 had not recognized Burton's name when it was mentioned on the juror questionnaire. *Id.* at 853, 859. The court questioned juror 12 and learned that she had met Burton at the Lummi Business Council's "CARE" office, a chemical dependency treatment program, where juror 12 went to provide information that would help juror 12's nephew obtain services. *Id.* at 854-55. Juror 12 said she believed she had met Burton "maybe twice" about two years before the trial. *Id.* at 856. The prosecutor pressed juror 12 to admit that she had a "positive experience" or "a pretty good feeling" about Burton. *Id.* at 857-58. Juror 12 unequivocally responded that she did not have any positive feelings about Burton as an individual

but instead had positive feelings about the Lummi Nation's ability to marshal social

services for its members:

> JUROR NO. 12: Do I believe she was a positive person for him? I can't say that because I think what was more positive for my nephew is when he finally went to treatment.

> [STATE]: My question is not so much about the nephew, but do you feel like, do you feel like it was a positive experience for you to deal with her?

> JUROR NO. 12: I am not really sure. I can't say that because I've worked with, you know, she was only the first CARE program in Washington and I know the director of the CARE program.
>  . . . .

> JUROR NO. 12: . . . [T]here was no good or bad, it was just all, you know, normal as it would be trying to just get the help I wanted for my family member.
>  . . . .

> [STATE]: So that's kind of a positive thing or positive feeling that you're having about Ms. Burton; is that right?

> JUROR NO. 12: Well, it's not Ms. Burton, it's my nephew I'm more positive with. She wasn't inter-reacting with my nephew while he was gone or when he came back. It's more what he did for himself.

> [STATE]: I understand that, but it sounds like you kind of intellectualized it. I mean you're talking about, I mean you had a pretty good feeling, you must have a pretty good feeling about Ms. Burton and how she helped you; isn't that fair?

> JUROR NO. 12: I guess. It's not, I wouldn't call it from her. I'd call it *from our own community* for the help so *that's what your tribe is for* is to try to help the funds *with our community* people that need the assistance.

> [STATE]: What do you think about me cross-examining her, is that something that concerned you?
>
> JUROR NO. 12: No, I just brought up that I think I knew her. I don't socialize with her or anything. I just kind of recognize her. I don't know her by name, or first name.
>
> . . . .
>
> JUROR NO. 12: I can tell you that if I was to see her again out on the road I probably won't remember her again any way.

*Id.* at 857-59 (emphasis added).

After the questioning, the prosecutor moved to dismiss juror 12 even though he could not point to any evidence that she was biased:

> Now, whether I can absolutely put a finger on that she can't be fair or whether what she says . . . about being fair or not I think that's kind of besides the point. She, through a lot of questioning eventually said that she, you know, had some good feelings about what Ms. Burton *or the community* had done and I'm asking that she be excused.

*Id.* at 860 (emphasis added). Defense counsel countered that juror 12's interactions with Burton were perfunctory—"simply [to] facilitate what the tribe has available, give him a bus ticket and bed date"—and did not give rise to any personal feeling whatsoever. *Id.* at 861.

The trial court stated that this was a "close case" but dismissed juror 12 because *Burton* was such an important witness. *Id.* Defense counsel then renewed her objection, pointing out that juror 12 appeared to be the only tribal citizen on the

jury panel. *Id.* The court acknowledged that this was a concern but reasoned that "certainly it would be inappropriate for the Court to retain any juror because of their affiliation with the tribe or their ethnic status or similar qualities." *Id.* at 861-62.

The jury convicted Sassen Van Elsloo. He appealed, arguing among other things that juror 12 was improperly dismissed. *State v. Sassen Vanelsloo*, No. 72553-0-I, slip op. at 2-3 (Wash. Ct. App. Feb. 6, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/725530.pdf. The Court of Appeals rejected that argument because juror 12 had admitted to positive feelings about "her tribe's support." *Id.* at 6. It reasoned that "[t]he trial court was in the best position to gauge juror 12's demeanor, facial expressions, and other nonverbal communications to assess whether she was biased." *Id.*

In his petition for review, Sassen Van Elsloo renewed his argument that juror 12 was improperly dismissed and pointed out that the trial court made no findings about her demeanor or other nonverbal cues. He contends that it is error under RCW 2.36.110, which governs juror dismissals at any time, and RCW 4.44.170(2), which describes "[p]articular causes of challenge" during voir dire, to dismiss a juror who manifests no actual or implied bias. We granted review, *State v. Sassen Van Elsloo*, 189 Wn.2d 1008, 403 P.3d 39 (2017), and now reverse and remand for a new trial.

8

ANALYSIS

I.      The trial court's dismissal of juror 12 violated the defendant's and the
        juror's constitutional rights

        *A. There is no evidence that juror 12 was biased*

The lead opinion concludes that there is no evidence that juror 12 was biased

and that the remedy for improperly dismissing her is to reverse and remand for a

new trial. I agree.

We review a trial court's decision to discharge a juror for abuse of discretion.

*State v. Depaz*, 165 Wn.2d 842, 858, 204 P.3d 217 (2009). "The range of

discretionary choices is a question of law and the judge abuses his or her discretion

if the discretionary decision is contrary to law." *State v. Neal*, 144 Wn.2d 600, 609,

30 P.3d 1255 (2001) (citing *State v. Williamson*, 100 Wn. App. 248, 257, 996 P.2d

1097 (2000)).

RCW 2.36.110 and Criminal Rule (CrR) 6.5 govern discharge and excusal of

impaneled jurors. CrR 6.5 broadly states that "[i]f at any time before submission of

the case to the jury a juror is found *unable* to perform the duties the court shall order

the juror discharged." (Emphasis added.) RCW 2.36.110 states:

> It shall be the duty of a judge to excuse from further jury service any
> juror, who in the opinion of the judge, has manifested unfitness as a
> juror by reason of *bias, prejudice, indifference, inattention* or any
> physical or mental defect or by reason of conduct or practices
> incompatible with proper and efficient jury service.

9

(Emphasis added.) In other words, a juror cannot be dismissed just to be sure they don't lean too far toward believing one witness or another. A seated juror can be discharged or excused only for specific reasons like bias, prejudice, inability to perform, and the like.

The lead opinion is correct that chapter 2.36 RCW does not define the main term at issue here, "bias." Lead opinion at 8-10. In this case, however, it is unnecessary to determine the specific contours of the bias required for dismissal. The reason is that there is no indication that juror 12 harbored any bias at all.

The trial judge basically acknowledged this. She agreed with defense counsel's statement that "[juror 12] stated nothing about how she couldn't be fair or that she had any feeling one way or another" and concluded that juror 12 should instead be dismissed because the alibi witness was so important. 5 VRP (July 29, 2014) at 861.

Indeed, despite repeated questioning by the State, juror 12 clearly stated that she did *not* have positive feelings about alibi witness Burton. Instead, her brief prior interaction with Burton gave her only positive feelings for her tribe, the Lummi Nation:

[STATE]: So did you have a positive experience with her?

. . . .

JUROR NO. 12: Do I believe she was a positive person for him? I can't say that because I think what was more positive for my nephew is when he finally went to treatment.

. . . .

[STATE]: I understand that, but it sounds like you kind of intellectualized it. I mean you're talking about, I mean you had a pretty good feeling, you must have a pretty good feeling about Ms. Burton and how she helped you; isn't that fair?

JUROR NO. 12: I guess. It's not, I wouldn't call it from her. I'd call it from our own community for the help so that's what your tribe is for is to try to help the funds with our community people that need the assistance.

*Id.* at 857-59. This record, as discussed by the lead opinion, shows that juror 12 was indifferent to Burton. Lead opinion at 11-12 ("Juror 12 made it clear that her interactions with Burton were neither positive nor negative, despite being asked four times by the prosecutor whether she had positive feelings toward Burton.").

As the lead opinion concludes, indifference toward a witness does not justify dismissal under the governing statute, RCW 2.36.110. *Id.* at 11. And a juror's mere acquaintance with a witness is not grounds for finding a juror unfit to serve. *See State v. Tingdale*, 117 Wn.2d 595, 601, 817 P.2d 850 (1991) (citing *Wise v. Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985)).

11

The State implicitly acknowledged as much at trial. It moved for dismissal not because of evidence showing juror bias but because it "viewed Ms. Burton to be a very critical witness in this case. She is an alibi witness and, you know, if the jurors believe Ms. Burton then it's a big deal. . . . [I]f they believe her that means my case goes nowhere." 5 VRP (July 29, 2014) at 860. The State goes on to say that "whether I can absolutely put a finger on that she can't be fair or whether what she says is about, what she says about being fair or not I think that's kind of besides the point." *Id.*

Being fair, however, is not beside the point. The grounds for dismissal or excusal are unfitness, bias, and the like—matters that implicate a juror's ability and willingness to deliberate fairly and impartially. The State points to no evidence that juror 12 was unable to do that. It relies only on the assumption that juror 12 might be more favorable to the defense.

The trial court nevertheless granted the State's request for dismissal and did so for the reasons advanced by the State. It ruled not that juror 12 was biased but that alibi witness Burton was important: "[E]ven though there is not a real strong relationship between the juror and the witness[,] I think given the importance of the witness's role in the case it's appropriate for Juror 12 to be excused." *Id.* at 861.

*B. There was evidence only that juror 12 and the alibi witness shared an affiliation with the Lummi Nation*

While the State and the trial court pointed to no evidence of actual bias, they did point to a different fact. The State argued that juror 12 would believe the defense alibi witness because of her positive feelings about her "community" or "tribe." *Id.* at 859.

Juror 12, however, repeatedly stated that her positive feelings were toward her tribal community, rather than Burton, for the assistance given to juror 12's nephew. In arguing for juror 12's dismissal, the State conflates the two, stating, "[Juror 12], through a lot of questioning eventually said that she, you know, had some good feelings about what Ms. Burton or the community had done and I'm asking that she be excused." *Id.* at 860. The State thereby suggests that juror 12 is biased due to a mutual affiliation with the Lummi Nation.

To be sure, the trial court found that the State did not engage in intentional discrimination. *Id.* at 862. But the record does show that the prosecutor made an assumption about juror 12's ability to discharge her civic duty based on her tribal affiliation. And the trial court dismissed juror 12 based on the same assumption that her tribal affiliation would cause her to view the facts favorably for the defense.

13

> C. *Dismissal of a seated juror due to tribal affiliation is unconstitutional*

It is impermissible to dismiss a seated juror based on her tribal affiliation or an assumption that her tribal affiliation would influence her view of another tribal member's testimony that was favorable to the defense.

First of all, our cases hold that dismissing holdout deliberating jurors because of their view of the facts "risks violating the Sixth Amendment right to an impartial jury." *State v. Elmore*, 155 Wn.2d 758, 772, 123 P.3d 72 (2005) (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22); *see also United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999) ("[I]f the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."). In this case, the trial court judge dismissed juror 12 because of vague concerns that the juror might believe the defense, without any evidence of bias. 5 VRP (July 29, 2014) at 861. Following the reasoning of *Elmore*, dismissal of seated jurors due to assumptions about how they view the facts is also improper.

But an additional concern here is the reason for the unsupported assumption that juror 12 would view witness Burton's alibi testimony too favorably. The reason was the juror's and the witness's common affiliation with the Lummi Nation. In other words, it was an assumption about the juror's fairness and fitness based on her

14

Indian heritage. It is impermissible to make such unsupported assumptions about whether a person will fairly and impartially discharge their civic duty based on their status as an Indian. *Cf. State v. Monday*, 171 Wn.2d 667, 678, 257 P.3d 551 (2011).

In the context of juror dismissal or excusal, it is also unconstitutional. As the United States Supreme Court has stated in a similar context, "Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, but racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.'" *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (citation omitted) (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) and citing *Strauder v. West Virginia*, 100 (10 Otto) U.S. 303, 308, 25 L. Ed. 664 (1880)). The same is true of discrimination involving a seated juror. The "very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality,' and undermines public confidence in adjudication." *Id.* at 238 (quoting *Powers v. Ohio*, 499 U.S. 400, 412, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) and citing *Georgia v. McCollum*, 505 U.S. 42, 49, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 628, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991); *Batson*, 476 U.S. at 87).

Positive feelings about a community—in this case a tribal nation—without any proof of bias cannot be used as a reason for dismissing a seated juror. *See* RCW 2.36.110.

The trial court's decision to dismiss juror 12 violated the right to an impartial jury (U.S. CONST. amend. VI; WASH. CONST. art. I, § 22), the right to jury unanimity (WASH. CONST. art. I, § 21), and the Fourteenth Amendment's equal protection clause (U.S. CONST. amend. XIV).

### D. The constitutional harmless error standard applies

"[M]ost constitutional errors can be harmless," *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). But if a "trial error is of constitutional magnitude, prejudice is presumed and the State bears the burden of proving it was harmless beyond a reasonable doubt." *State v. Coristine*, 177 Wn.2d 370, 380, 300 P.3d 400 (2013) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State v. Irby*, 170 Wn.2d 874, 886, 246 P.3d 796 (2011)); *Monday*, 171 Wn.2d at 680.

The State makes no argument that this constitutional error was harmless. Under the *Chapman* standard, a new trial is required. *Coristine*, 177 Wn.2d at 383.

II.     There was sufficient evident to support the firearm enhancement

The lead opinion states that although it need not reach the issue, the evidence was sufficient to support the firearm enhancement. Lead opinion at 27.

16

I agree that the evidence was sufficient. But I do not agree with the unsupported assertion that we need not reach that sufficiency of evidence issue. In fact, if the firearm enhancement is akin to a crime or an element, then we *must* reach that issue: reviewing courts are obligated to address insufficiency of the evidence claims concerning crimes or elements because insufficient evidence bars retrial.[3] On the other hand, if the firearm enhancement is not akin to a crime or an element, then we need not reach the issue because insufficient evidence would not bar retrial.

This court has not yet decided whether firearm enhancements fall into the former category or the latter one.[4] And the parties have not briefed that issue. Hence, I do not read the lead opinion's statement that it reaches this issue only to provide guidance as a holding on that point. I simply agree with the lead opinion's conclusion that the evidence in this case was sufficient. Lead opinion at 27-33.

---

[3] *Lockhart v. Nelson*, 488 U.S. 33, 39, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988) (citing *Burks v. United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 24, 98 S. Ct. 2151, 57 L. Ed. 2d 15 (1978); *Hudson v. Louisiana*, 450 U.S. 40, 42-43, 101 S. Ct. 970, 67 L. Ed. 2d 30 (1981)); *State v. Anderson*, 96 Wn.2d 739, 742, 638 P.2d 1205 (1982).

[4] *See State v. Allen*, 1 Wn. App. 2d 774, 781-82, 407 P.3d 1116 (2017) (disagreeing with the State's argument that Washington does not apply double jeopardy protections to aggravating factors in noncapital cases), *review granted*, 190 Wn.2d 1007, 414 P.3d 575 (2018).

CONCLUSION

"'Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try'; it also shamefully belittles minority jurors who report to serve their civic duty only to be turned away on account of their race." *State v. Saintcalle*, 178 Wn.2d 34, 41, 309 P.3d 326 (2013) (plurality opinion) (quoting *Batson*, 476 U.S. at 87). The trial court's assumption that juror 12's ties to her tribal nation meant that she was biased were unfounded and unlawful. A juror cannot be dismissed simply because of tribal affiliation.

The trial court's decision to dismiss juror 12 was an error of constitutional magnitude. The State therefore bears the burden of proving that the error was harmless beyond a reasonable doubt, and it fails to carry that burden.

I agree with the lead opinion that we must reverse and remand for a new trial. I also agree that the State presented sufficient evidence to uphold the firearm enhancement.

I therefore respectfully concur.

18

Gordon McCloud, J.

González, J.

Ju., J.

Fairhurst, CJ.

*State v. Sassen Van Elsloo (Adrian)*
(Stephens, J., dissenting in part/concurring in part)

No. 94325-7

STEPHENS, J. (dissenting in part/concurring in part)—I respectfully dissent

in part.[1] Even accepting that the trial court abused its discretion in removing juror

12 from the panel, a new trial is not warranted on that basis. Adrian Sassen

Van Elsloo has no constitutional right to a particular juror, and he made no objection

to the jury panel that ultimately decided his case. Absent a showing of prejudice by

Van Elsloo, his conviction must be affirmed. The lead opinion goes astray by

shifting the burden to the State to establish harmless error, on the premise that the

erroneous removal of an empaneled juror implicates the same constitutional interests

as when a deliberating juror is removed for reasons that possibly stem from the

---

[1] I concur in Part III of the lead opinion upholding imposition of the firearm enhancements.

juror's "views of the merits of the case." Lead opinion at 1. The two situations are, in fact, quite different. Courts properly inquire into juror bias during voir dire and when issues arise midtrial to make certain that potential and empaneled jurors can fairly and impartially decide the case. If jurors express "views of the merits of the case" before hearing all the evidence, they should not serve. Once jury deliberations commence, however, courts must proceed with caution because calls to remove a particular juror for misconduct might implicate the juror's views about the case based on the evidence, for example, if the juror seems to be a "holdout." Caution in removing a deliberating juror is thus necessary to safeguard the defendant's constitutional right to an impartial jury and to a unanimous verdict.

When questions of juror bias arise midtrial, as here, the trial court's decision whether to replace a juror with an alternate is governed by RCW 2.36.110 and CrR 6.5. The court exercises considerable discretion. While this discretion may be abused when a juror is removed without a sufficient showing of bias, the error should be treated the same as any erroneous dismissal of an empaneled juror, for example dismissal of the wrong alternate juror. In such instances, prejudice is not presumed but must be shown by the complaining party. Because Van Elsloo makes no attempt to demonstrate any prejudice, I would affirm the Court of Appeals and uphold his convictions.

I. The Erroneous Dismissal of an Empaneled Juror Midtrial Does Not Warrant Reversal of a Conviction Absent a Showing of Prejudice

The lead opinion identifies the three phases of trial during which a trial court might need to consider excusing or dismissing a particular juror. The first is voir dire, a process designed to ensure the defendant's Sixth Amendment right to trial by a fair and impartial jury of his peers. *State v. Phillips*, 65 Wash. 324, 327, 118 P. 43 (1911); U.S. CONST. amend VI. At the heart of voir dire is the examination of potential jurors for bias or prejudice. *See* RCW 4.44.170. The relevant inquiry considers whether the juror can set aside any preconceived notions and regard the case impartially. *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991). "If the challenge is sustained, the juror shall be dismissed from the case." RCW 4.44.240. "The law presumes that each juror sworn in a case is impartial and above legal exception, otherwise he would have been challenged for 'cause.'" *State v. Persinger*, 62 Wn.2d 362, 366, 382 P.2d 497 (1963). "An accused cannot complain if he is tried by an impartial jury. He can demand nothing more." *Id.*

A bookend to this first phase of trial is the third phase of trial: jury deliberations. Deliberations commence only once the jury has heard all the evidence and received the trial court's instructions. Calls to remove a juror during this phase may implicate the defendant's rights to a fair trial before an impartial jury and to a

unanimous verdict. *State v. Elmore*, 155 Wn.2d 758, 781, 123 P.3d 72 (2005); *State v. Ashcraft*, 71 Wn. App. 444, 463, 859 P.2d 60 (1993); *State v. Depaz*, 165 Wn.2d 842, 855, 204 P.3d 217 (2009). This is so because "a deliberating juror must not be dismissed where there is any reasonable possibility that the impetus for dismissal is the juror's views of the sufficiency of the evidence." *Elmore*, 155 Wn.2d at 761. The improper removal of a juror under this standard is an error of constitutional magnitude that is presumed prejudicial. *Ashcraft*, 71 Wn. App. at 465. Accordingly, "the reviewing court examines the effect the error had on the defendant's trial according to the harmless error standard." *Id.* at 464 n.8 (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). Examples of constitutional violations occurring during jury deliberations include removing a "holdout" juror, *Elmore*, 155 Wn.2d at 772, or failing to reinstruct a reconstituted jury on the record to begin deliberations anew, *Ashcraft*, 71 Wn. App. at 464-65.

This case concerns the trial court's decision to remove a juror midtrial, after the jury is empaneled but before deliberations begin. The trial court has an ongoing obligation "to excuse any juror who is unfit and unable to perform the duties of a juror." *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000) (citing

RCW 2.36.110;[2] CrR 6.5[3]). The relevant inquiry considers whether the record demonstrates juror unfitness, whether by reason of misconduct, inattentiveness, bias, or prejudice. *Jorden*, 103 Wn. App. at 229. The trial judge has considerable discretion to resolve claims of unfitness in a way that avoids creating prejudice against either party. *Id.* A reviewing court will not disturb the trial court's decision unless the complaining party shows both an abuse of discretion and resulting prejudice. *State v. Williamson*, 100 Wn. App. 248, 253, 996 P.2d 1097 (2000).

Generally, the removal of an empaneled juror and replacement with an alternative juror prior to the commencement of deliberations is not seen as prejudicial. *Depaz*, 165 Wn.2d at 857; *Jorden*, 103 Wn. App. at 229. "A defendant has no right to be tried by a particular juror or by a particular jury." *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995). If the reconstituted jury that ultimately decides the case is unobjectionable, the defendant is not entitled to reversal of the conviction. *Id.* at 615-16.

---

[2] "It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110.

[3] "If at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." CrR 6.5.

While the lead opinion acknowledges RCW 2.36.110, CrR 6.5, and our precedent, it refuses to require a showing of prejudice by Van Elsloo before reversing his conviction. Instead, the lead opinion presumes prejudice and places the burden on the State to show harmless error. As explained below, this new approach is unwarranted.

II. The Lead Opinion Improperly Shifts the Defendant's Burden To Show Prejudice, Instead Requiring the State To Show Harmless Error

In presuming prejudice and burdening the State with showing harmlessness, the lead opinion reasons that the removal of juror 12 implicated Van Elsloo's Sixth Amendment rights to a fair trial and to a unanimous verdict in much the same way that removing a deliberating juror might. Thus, it holds that prejudice is presumed and the State bears the burden of showing that the removal of juror 12 was harmless error. This holding reflects a misunderstanding of our precedent and of the facts in this case. Moreover, the new rule the lead opinion announces relies on a decision from another jurisdiction that was not cited by the parties and rests on entirely different circumstances and procedural rules.

The lead opinion invokes the "reasonable possibility" standard of *Elmore*, which states that "where a deliberating juror is accused of refusing to follow the law, that juror cannot be dismissed when there is any reasonable possibility that his or

her views stem from an evaluation of the sufficiency of the evidence." 155 Wn.2d at 778. Recently, we have emphasized that "this standard is applicable only in the rare case where a juror is accused of engaging in nullification, refusing to deliberate, or refusing to follow the law." *Id.*; *see also Depaz*, 165 Wn.2d at 855 (rejecting application of the "reasonable possibility" standard outside of the *Elmore* context (citing *Elmore*, 155 Wn.2d at 774)). The concern is that claims of juror misconduct during deliberations might mask disagreements between the target juror and the rest of the panel, such that removal of the juror would violate the defendant's right to a unanimous decision.

There is an obvious difference between such claims of juror misconduct during deliberations and claims that a potential or empaneled juror is biased or prejudiced. The lead opinion appears to equate "bias" with the juror's "views of the merits of the case." Prior to the commencement of deliberations, the trial court has an ongoing obligation to assure that the jurors who ultimately decide the case can do so fairly and impartially. If they are biased or prejudiced—i.e., if they have preconceived "views of the merits of the case"—they should not serve. By equating impermissible juror bias with the protected views of a deliberating juror, the lead opinion completely undermines a central purpose of RCW 2.36.110 and CrR 6.5, to remove and replace biased jurors.

The lead opinion also misunderstands the facts of this case. It acknowledges that juror 12 was challenged after she indicated her past interactions with a key witness in the case. The question was whether her acquaintance with the witness would hinder her ability to be a fair and impartial juror. Under RCW 2.36.110 and CrR 6.5, if the answer to this question was yes, then the trial court unquestionably should have removed the juror. But, it appears the trial court answered no to the critical question of bias. *See* lead opinion at 11 ("The record indicates that juror 12 was dismissed because Burton was a critical witness for the defense, not because juror 12 displayed actual bias."); *id.* ("[T]he record contains no indication that juror 12 formed an opinion about Burton or that such opinion would prevent her from trying the case impartially. The record indicates that juror 12 was indifferent to Burton, not biased toward her.").[4]

---

[4] The record contains the following exchange indicating the trial court did not conclude that juror 12 was biased:

> MS. ANDERSON [Sassen Van Elsloo's counsel]: [S]he stated nothing about how she couldn't be fair or that she had any feeling one way or another.
>
> THE COURT: You know, that's true. It's a close case, but I think I'm going to rule that the juror should be let go. Counsel points out correctly that Ms. Burton is a critical witness and even though there is not a real strong relationship between the juror and the witness[,] I think given the importance of the witness's role in the case it's appropriate for Juror 12 to be excused.

5 Verbatim Report of Proceedings (July 29, 2014) (VRP) at 861; *see also* Br. of Appellant at 24 ("Juror 12 made clear that her passing contact with Burton two years previously was neither a positive or negative experience. Juror 12 was indifferent towards Burton."); Br.

The trial court's error was in removing the juror without sufficient cause—an error that does not suggest any improper incursion into jury deliberations or implicate Van Elsloo's constitutional rights.[5] This case is thus distinguishable from *Elmore*. The "reasonable possibility" standard has no place in this context.

In order to support its holding of presumed prejudice here, the lead opinion must merge *State v. Irby*, 170 Wn.2d 874, 246 P.3d 796 (2011) with *Hinton v. United States*, 979 A.2d 663 (D.C. 2009) for the proposition that jurors are not fungible after voir dire because "[r]easonable and dispassionate minds may look at the same evidence and reach a different result." *Irby*, 170 Wn.2d at 886-87; *see also Hinton*, 979 A.2d at 689 ("Once they start hearing and considering the evidence, individual jurors may evaluate it differently, and they may no longer be viewed as fungible merely because they have passed muster in voir dire."); lead opinion at 23. *Irby* is distinguishable because it involved the trial court's error in conducting voir dire by

_____

of Resp't at 14 ("In this case, the trial court determined the juror at issue should be removed in an abundance of caution for bias but did not conclude whether the bias was implied based on the circumstances that presented or actual based on the jurors demeanor and responses to inquiries during the limited mid-trial examination had by the parties."); VRP at 860 ("'Now, whether I can absolutely put a finger on that she can't be fair or whether what she says is about, what she says about being fair or not I think that's kind of beside[] the point.'" (quoting the prosecutor)).

[5] I agree with the lead opinion that the record in this case does not support raising a *Batson* issue sua sponte. *See* lead opinion at 26 n.7; *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

e-mail without the defendant being present to offer input into the selection of jurors. In the context of this due process violation of the right to be present, the court observed that the defendant must be allowed to help select the particular jurors who constitute his jury. *Id.* at 885-87. Our case lacks this constitutional defect, and the language in *Irby* should not be stretched beyond its context. To apply *Irby* to the present facts results in a holding that runs headlong into the recognized premise that "[a] defendant has no right to be tried by a particular juror or by a particular jury." *Gentry*, 125 Wn.2d at 615. The lead opinion's reliance on *Phillips*, a voir dire case applying the "demonstration of prejudice" standard, likewise is misplaced. *See Phillips*, 65 Wash. at 327 ("All the law requires is that a defendant shall be tried by a qualified and impartial jury of his peers. Such a jury was secured in this cause, and appellant has suffered no prejudice.").

The lead opinion's reliance on the District of Columbia Court of Appeals decision in *Hinton* is also unconvincing. *Hinton* involved the removal of a juror based on his conduct during trial, including submitting several questions to witnesses. 979 A.2d at 668-69. The trial court stated its concern "'that he's a strange person and that he won't be able to deliberate fairly because of his strangeness.'" *Id* at 669. Directly implicating concerns of juror unanimity, the court opined, "'[T]his is a hung jury waiting to happen because . . . he doesn't think along the wavelength

of normal functioning people in my view.'" *Id.* at 670 (second alteration in original).

The court appropriately reversed. Finding the trial court violated relevant court rules by removing the juror on this basis, the court observed that "such an error also may threaten the independence of the jury's decision-making from undue judicial influence and the defendant's basic rights to trial by jury and a unanimous verdict." *Id.* at 689. This concern is absent in our case. The sole concern was juror 12's acquaintance with a witness. And upon dismissing juror 12, the court said nothing that might have compromised the remaining jurors: they were simply advised that juror 12 had an unexpected connection with an unnamed witness in the case. An unobjectionable alternate juror was sworn in, and the trial continued. The lead opinion points to no incidence in the record where the court offered the remaining jurors any opinions on the credibility of witnesses, sufficiency of the evidence, or "views of the merits of the case." Nor does it reference in the record where juror 12 did so. The concerns that led the court in *Hinton* to presume prejudice are absent here.[6]

---

[6] The source of the presumed prejudice rule in *Hinton* is also inapplicable here. The court in *Hinton* invoked the "grave doubt" standard applicable in federal cases when the court concludes that a nonconstitutional error had a substantial influence on the outcome of the case. 979 A.2d 690-91. In such cases, prejudice is presumed and "the government bears the 'burden of showing the absence of prejudice.'" *Id.* at 691 (quoting *United States v. Olano*, 507 U.S. 725, 741, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)). As noted, in this

The handful of other courts to cite *Hinton* appear to limit it to its narrow facts. Although *Hinton* has been considered in federal courts, the Virgin Islands, and the District of Columbia, I could find only two other state decisions that consider it. A dissenting opinion in the Florida District Court of Appeal cited *Hinton* as applying a prophylactic rule to prevent a judge from influencing the jury after it begins to hear evidence. *Nicholas v. State*, 47 So. 3d 297, 312 (Fla. Dist. Ct. App. 2010) (Wallace, J., dissenting in part). However, the Florida court found no abuse of discretion when the trial court dismissed a juror for potentially concealing his relationships to a witness and defendant in a drug-trafficking trial, where the juror had purchased drugs from the witness. *Id.* at 302.

In *Bruckshaw v. Frankford Hospital of Philadelphia*, the Supreme Court of Pennsylvania included *Hinton* in a string cite in the course of ordering a new trial. 619 Pa. 135, 58 A.3d 102 (2012). There, a court clerk, without notice to the court or the parties, replaced a juror with an alternate juror without development in the record. *Id.* at 113. Under these irregular circumstances, prejudice was presumed by the court. *Id.* Our case lacks the egregious circumstances in these cases, as well as in *Hinton*. Perhaps this is why none of the parties in this case cite *Hinton* as either

---

case, the trial court's nonconstitutional error merely involved insufficient findings to support removal of a juror under the governing statute and court rule.

-12-

binding or persuasive authority. The lead opinion provides no compelling justification for embracing *Hinton*'s rule of presumed prejudice in this case. Nor does it explain how we can do so without overruling our own precedent.

In contrast to *Hinton*, we have held that the constitutional right to an impartial jury is not violated when an empaneled juror is replaced by an alternate, so long as the defendant participated in the selection of both jurors and alternates, and the panel was accepted by the defendant. *Gentry*, 125 Wn.2d at 616. The defendant must show prejudice for any abuse of discretion involving removal of a juror in noncompliance with a procedural rule. *Id.* Here, the court removed juror 12 without the adherence to RCW 2.36.110 but without violating a constitutional right to an impartial jury or a unanimous verdict. *Id.* If the lead opinion wishes to overturn our precedents, including *Gentry*, it must provide a clear showing that the "'established rule is incorrect and harmful.'" *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 280, 208 P.3d 1092 (2009) (internal quotation marks omitted) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004)); *id.* ("Where we have expressed a clear rule of law . . . we will not—and should not—overrule it sub silentio."). The lead opinion makes no attempt at such a showing.

We should adhere to our precedent and recognize that the erroneous removal of a juror under RCW 2.36.110 and CrR 6.5 is not reversible error absent a showing

of prejudice. Because Van Elsloo fails to demonstrate any prejudice from the removal of juror 12, I would affirm his conviction.

Stephens, J.

Johnson

Owens, J.

Madsen, C.J.